UNIVERSAL ELECTRONICS
INC., Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 96–1345.

United States Court of Appeals,
Federal Circuit.

April 24, 1997.

---

Timothy B. Dyk, Jones, Day, Reavis & Pogue, Washington, D.C., argued, for plaintiff-appellant. With him on the brief was Sharon K. Mollman.

Saul Davis, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, International Trade Field Office, New York City, argued, for defendant-appellee. With him on the brief was Joseph I. Liebman, Attorney in Charge. Also with him on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Department of Justice, Washington, D.C. Of counsel on the brief was Sheryl A. French, International Trade Field Office, New York City.

Before LOURIE, CLEVENGER, and RADER, Circuit Judges.

CLEVENGER, Circuit Judge.

This classification dispute asks whether the hand-held remote-control units imported by Universal Electronics, Inc. (Universal) were properly classified under the 1993 version of the Harmonized Tariff Schedule of the United States (HTSUS). The United States Customs Service (Customs) determined, and the Court of International Trade agreed, that the subject imports should be classified under subheading 8537.10.00, HTSUS, which includes bases for electric control. We affirm.

I

Universal imports hand-held remote-control units that are used to control televisions, stereos, and other home appliances equipped with an infrared receiver. These units contain a microprocessor, infrared light-emitting diodes (LEDs), and a software database that includes the infrared command codes for various brands and types of home appliances.

After purchase of the remote control, the consumer configures it to govern a specific home appliance by entering a code corresponding to the appliance's brand and type. When the consumer later presses a key on the remote control, e.g., "volume up," the microprocessor is electrically activated to search the software database for the appropriate command code sequence. Once this command code sequence is located, electricity provided by a battery in the unit drives the LEDs to emit infrared light pulses in the requisite pattern.

When the target appliance receives these infrared pulses, it typically translates the pulses into an electrical signal and electrically conveys that signal to its microprocessor. Using electricity, the microprocessor decodes this signal, and, if the code is recognized as a proper one, the microprocessor employs electricity to perform the requested function, e.g., increasing the volume level.

Before enactment of the HTSUS, Customs ordinarily classified remote controls as television apparatus under item 685.19 of the Tar-

iff Schedules of the United States (TSUS). In so doing, Customs expressly declined to classify the remote controls under heading 685.90 of the TSUS because the imports were not "control panels." [1]

After the HTSUS was enacted, Customs began classifying the subject imports under subheading 8537.10.00 (HTSUS), which was the successor to Item 685.90 of the TSUS. Customs did so because 8537.10.00 was broadened to include not only control panels, but also "[b]oards, panels . . . and other bases . . . for electric control or the distribution of electricity."

Universal appealed Customs' classification decision to the Court of International Trade arguing, primarily, that the subject imports are not devices "for electric control." Universal argued that the subject imports should instead be classified as either: (i) "[e]lectrical machines and apparatus, having individual functions, not specified or included elsewhere in this chapter" under subheading 8543.80.90 of the HTSUS, or (ii) "[e]lectric sound or visual signaling apparatus" under subheading 8531.80.00 of the HTSUS.

The Court of International Trade determined that:

> HTSUS subheading 8537.10.00 refers to a very broad range of items. The subheading covers, among other things, foundations, which may be flat, upon which two or more electrical devices listed in heading 8536, such as switches and terminals . . . are mounted. In addition, these foundations . . . must be a part of a system in which information is input, and as a consequence, electricity causes the desired result to occur.

The court then applied this interpretation to the subject imports and determined that they fell within the subheading. The court also considered, but rejected, Universal's argument that the subject imports were better described by the other classification provisions.

**1.** TSUS Item 685.90 includes:
Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof.

Universal appeals from the decision of the Court of International Trade, which we review pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## II

■ As we have often explained, a classification decision, ultimately, is a question of law based on two underlying steps. The first step concerns the proper meaning of the tariff provisions at hand; this is a question of law, which we review *de novo*. *Intel Singapore, Ltd. v. United States*, 83 F.3d 1416, 1417–18 (Fed.Cir.1996). The second step concerns whether the subject imports properly fall within the scope of the possible headings; this is a question of fact, which we review for clear error. *Id.*

■ By statute, Customs' classification decision "is presumed to be correct." 28 U.S.C. § 2639(a)(1) (1994). Universal argues, however, that the presumption of correctness applies only when a factual dispute exists. In situations where only a legal dispute exists, Universal argues, the presumption does not apply. In support, Universal cites to our precedent, *Goodman Manufacturing, L.P. v. United States*, 69 F.3d 505, 508 (Fed.Cir. 1995), which states: "Because there was no factual dispute between the parties, the presumption of correctness is not relevant."

Customs responds that long-standing precedent of this court and its predecessor court makes clear that the statutory presumption of correctness applies to the ultimate classification "decision," and not merely to the underlying factual issue. *See, e.g., Marubeni Am. Corp. v. United States*, 35 F.3d 530, 536 (Fed.Cir.1994); *United States v. New York Merchandise Co.*, 58 C.C.P.A. 53, 435 F.2d 1315, 1318 (1970). Therefore, Customs argues, the presumption of correctness is always at play.

Customs is correct in noting that our precedent has long and continuously stated that the decision of Customs is presumed to be

correct. Before our decision in *Goodman*, however, our precedent had not clarified the aspects of Customs' decision to which the presumption applied.

The presumption of correctness is a procedural device that is designed to allocate, between the two litigants to a lawsuit, the burden of producing *evidence* in sufficient quantity.[2] Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect. The presumption of correctness certainly carries force on any factual components of a classification decision, such as whether the subject imports fall within the scope of the tariff provision, because *facts* must be proven via *evidence*.

The situation is quite different, however, with respect to pure questions of law, such as the proper interpretation of a particular tariff provision or term. Questions of law such as these lie within the domain of the

courts, for "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). In such a context, the importer has no duty to produce *evidence* as to what the law means because evidence is irrelevant to that legal inquiry.[3] Therefore, we conclude that although the presumption of correctness applies to the ultimate classification decision, Universal properly interprets *Goodman* as standing for the proposition that, as a practical matter, the presumption carries no force as to questions of law.[4]

It appears that as to questions of law, Customs seeks to apply the presumption of correctness not as a procedural device governing evidence, but rather as a means of affording deference to Customs' interpretation of the law. As we explained in *Goodman*, however, much of the confusion in this area of the law arises from commingling the notion of a presumption of correctness with the notion of deference—two notions that are designed to serve separate functions. *See Goodman*, 69 F.3d at 508.

2. Strictly speaking, the presumption of correctness appears to be an "assumption" rather than a true presumption. Whereas presumptions are employed to allocate the burden of production, assumptions are employed to allocate the burden of proof, which includes both the burden of production and the burden of persuasion. That the "presumption" of correctness is in reality an assumption is made plain by the fact that the statutory provision from which it arises is entitled "*Burden of proof;* evidence of value," and by the fact that it does not depend on the establishment of any basic fact. *See* 28 U.S.C. § 2639 (emphasis added); 21 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* §§ 5122, 5124 (1977).

3. *See, e.g., MGPC, Inc. v. Canadian Hidrogas Resources, Ltd.*, 725 F.2d 1376, 1378 (Temp.Emer.Ct.App.1983) (agreeing that "the district court should not have decided the case based upon which party had the burden of proof, because interpretation of the regulations in order to determine the maximum lawful price is a question of law, which the trial court had a duty to decide"); *ABKCO Indus., Inc. v. Commissioner*, 482 F.2d 150, 156 (3d Cir.1973) ("Strictly speaking, it may not be proper to refer to 'burden of proof' in reference to the resolution of a question of law."). Indeed, the Court of International Trade has been mandated the duty of reaching the correct result. *See* 28 U.S.C. § 2643(b) (1994).

Moreover, placing upon the importer the burden of proving the meaning of a tariff provision or term would undermine the desire for uniform and consistent interpretation of the customs law, which is central to customs policy. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 876 (Fed.Cir.1984). Under such an approach, the meaning of tariff terms could depend on the quality of the importer's advocacy and could shift from case to case based on the showing made by the particular importer. *See Verosol USA, Inc. v. United States*, 941 F.Supp. 139, 141 n. 5 (Ct. Int'l Trade 1996). The uniformity in this field is better promoted by requiring both this court and the Court of International Trade to determine the correct meaning of a tariff provision so that all future importers will know what the tariff provision means. *See Jarvis Clark*, 733 F.2d at 876.

4. This interpretation by no means vitiates the role of the presumption. First, we note that in any classification dispute, a significant question of fact is whether the subject imports fall within the scope of the properly construed tariff provision. Second, to say that evidence is irrelevant to a pure question of law is not to say that the importer plays no role in the issue. Although the importer has no duty on the issue, as a practical matter, the importer typically seeks to persuade the court, via argument, that the correct legal interpretation is that which is most favorable to the importer.

Unlike the burden of production and burden of persuasion, each of which allocates roles between the two parties to a litigation, deference is a legal concept that allocates roles between one adjudicating tribunal and another. For example, because an agency or a trial court may be better suited to make factual findings, a reviewing tribunal may sustain those factual findings unless they are clearly erroneous, unsupported by substantial evidence, or the like. Alternatively, reviewing tribunals generally decide questions of law *de novo* because they are equally well suited to make such decisions. Notions of deference are governed by standards of review and should not be confused with presumptions and other like procedural devices.

When viewed from the perspective of standards of review, it becomes evident that in classification disputes neither this court nor the Court of International Trade defers to Customs' decisions, whether factual or legal. The Court of International Trade does not defer to Customs' decisions because it has been tasked by Congress to conduct a *de novo* review, and to determine the correct classification based on the record made before it.[5] *See* 28 U.S.C. §§ 2640(a), 2643(b). On appeal, we review the Court of International Trade's factual findings—not those of Customs, unless they coincide—for clear error. *See Intel*, 83 F.3d at 1418. On questions of law, we defer to neither Customs' nor the Court of International Trade's interpretations; we decide such questions afresh.

To summarize, we agree with Customs that the presumption of correctness applies to the ultimate classification decision. Because the presumption relates to the presentation of evidence, however, as a practical matter, it has force only as to factual components of that decision (*i.e.,* components where evidence is required). Finally, the presumption of correctness, being a procedural device allocating the roles between the two litigating parties, is analytically distinct from the deference afforded to Customs' decision, which is instead governed by standards of review.

## III

Having addressed the parties' contentions regarding the role of the presumption of correctness, we next turn to the merits of this particular case. The tariff provision at issue, HTSUS subheading 8537.10.00, provides for:

> *Boards, panels (including numerical control panels), consoles, desks, cabinets and other bases,* equipped with two or more apparatus of heading 8535 or 8536 [such as switches, relays, and plugs], *for electric control* or the distribution of electricity, including those incorporating instruments or apparatus of chapter 90, other than switching apparatus of heading 8517: For a voltage not exceeding 1,000 V.

(emphasis added).

Universal contends that the Court of International Trade misconstrued the scope of this tariff provision. As explained above, construing this provision is a question of law, which we perform without deference to either Customs or the Court of International Trade, and which, theoretically, we determine without reference to the subject imports. In doing so, the terms within this provision should be construed in accordance with their common and popular meaning. *Marubeni Am.*, 35 F.3d at 534.

## A

Universal's lead argument is that the subject imports are not "for electric control." The dictionary definition of the noun "control" is "[t]he fact of controlling, or of checking and directing action; the function or power of directing and regulating; domination, command, sway." II Oxford English Dictionary 927 (1970). The Court of International Trade construed this term, within the

---

5. Moreover, as we recently explained in *IKO*, in the context of a classification dispute, neither this court nor the Court of International Trade defers to Customs' interpretation of a tariff heading on the basis of special deference pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *IKO Indus., Ltd. v. United States*, 105 F.3d 624, 626 (Fed.Cir.1997); *see also Anval Nyby Powder AB v. United States*, 927 F.Supp. 463, 468–69 (Ct. Int'l Trade 1996).

context of the tariff provision, as meaning the process of producing a desired result from a given input. The dictionary definition of the adjective "electric" is "[o]f the nature of, or pertaining to, electricity; producing, caused by, or operating by means of, electricity." III Oxford English Dictionary 76–77. Universal does not contest either the dictionary definition or the Court of International Trade's interpretation of the terms "control" or "electric," separately.

■ Universal challenges instead the Court of International Trade's combination of these two terms. The court determined that "for electric control" means that "information is input, and as a consequence, electricity causes the desired result to occur." The court's opinion makes clear that the "electricity" to which it refers is the electric current that ultimately causes the desired result, and not to intermediate signals.[6] Thus, the court interpreted "for electric control" as being a very broad clause that merely requires that the result desired (*e.g.,* an increase in volume) be caused via electricity.

Universal contends that "for electric control" should be construed to mean "the process of producing desired results from a given input *by means of electricity.*" In other words, the subject imports must *directly* generate an electric current that causes the desired result; it is not enough that the subject imports (via some non-electric means) cause the appliance to generate the electric current that causes the desired result.

We agree with the interpretation accorded to the phrase "for electric control" by the Court of International Trade, which comports with the ordinary, dictionary definitions of the terms. The tariff provision does not explicitly require the electric control to be direct. Absent such a statement, we see no reason to incorporate any specific limitations

as to which device (the subject imports or the appliance controlled) need create the electric current that produces the desired result. The requisite electric control, therefore, may be direct or indirect.

■ The next step, whether the subject imports fall within the aforementioned definition, is a question of fact, which we review for clear error. The Court of International Trade determined that "the subject remote controls are 'for electric control' because they serve as part of a control system: users input information into the remote controls, and as a consequence, electricity causes the desired result to occur." In other words, the subject imports are "for electric control" because the infrared signal emitted by the subject imports controls the flow of electricity within the target appliance. Indeed, the control of electricity in the target appliances is the sole purpose of the subject imports.

Moreover, we note that the subject imports themselves employ electric control. When the consumer presses a key on the remote control, switches are triggered that send an electric signal to the microprocessor within the remote control. After decoding this signal, the microprocessor sends another electric signal to the infrared transmitter. Thus, electricity is employed throughout the subject imports to achieve the desired output signal.

Throughout the entire system, from user input to desired action, the only non-electric signal is that of the infrared beam. As a result, we discern no clear error in the Court of International Trade's factual determination that the subject imports are employed "for electric control."

**B**

■ In the alternative, Universal contends that even if the subject imports are

6. For example, the court explained that a control panel located on the front of a television would fall within this provision because when the user presses the "channel up" button, the panel sends a control signal to the microprocessor, *which in turn sends "the necessary amount of electricity to the part of the appliance that makes the desired result occur."* (emphasis added). Similarly, the court explained that control boards that employ microwave signals would be devices "for electric control" because the "microwave signals command the microcontrollers to send the electricity necessary to make the desired results occur." In the court's view, the disputed clause requires that the ultimate result (*e.g.,* increasing the volume) be caused by electricity and that some device should control that result.

"for electric control," they do not fall within HTSUS subheading 8537.10.00 because they are not "[b]oards, panels (including numerical control panels), consoles, desks, cabinets and other bases, equipped with two or more apparatus of heading 8535 or 8536 [such as switches, relays, and plugs]." The Court of International Trade interpreted this portion of the tariff provision as follows: "the phrase 'panels ... and other bases,' as used in subheading 8537.10.00, refers to foundations, which may be flat, upon which electrical devices rest." This interpretation, with which we agree, is simply based on the common meanings of the terms and is virtually identical to Universal's proffered interpretation.

[redacted] The next step involves determining whether the subject imports are boards, panels, or bases. In other words, are they foundations, which may be flat, upon which electrical devices rest? Universal seizes upon the court's statement that the subject imports "*contain* several flat *panels*" and "many buttons that are switches are mounted on these panels." (emphasis added). From this statement, Universal mounts its argument that it is not enough for the article to *contain* a board, panel, or base; instead, the article must itself be a board, panel or base.

The problem with Universal's argument, however, is that it fails to acknowledge the court's ultimate conclusion that: "[c]onsequently, the Court finds that the subject remote controls *are bases* upon which two or more electrical devices of heading 8536 are mounted." (emphasis added). This conclusion is supported by Customs' expert who testified that "these remote control devices *are* clearly panels, boards and bases that contain many switches." The court's conclusion is also consistent with testimony from Universal's expert, who acknowledged that patents related to the subject imports routinely employed the terms "base" and "panel" to describe the devices. Accordingly, we perceive no clear error in the court's factual finding that the subject imports are bases.

IV

In conclusion, the presumption of correctness afforded to Customs' decisions is a procedural device that governs evidence. Accordingly, as *Goodman* stated, it has no force as to pure questions of law. Moreover, the presumption of correctness bears no relation to the deference afforded to Customs' decision, which is instead governed by standards of review. In the present case, we agree with the interpretation given the tariff provisions by the Court of International Trade. We also discern no clear error in that court's application of those provisions to the subject imports. Accordingly, the decision of the Court of International Trade is

*AFFIRMED.*