Slip Op. 01-100

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: RICHARD K. EATON, JUDGE**
_____

|  |  |  |
|---|---|---|
| **INTERNATIONAL HOME TEXTILES, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Court No. 99-10-00627** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

Importer brought suit challenging United States Customs Service's ("Customs") classification of apparel under subheading 6103.42.10 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1998), covering, <u>inter alia</u>, men's cotton trousers, breeches, and shorts, and under HTSUS subheading 6105.10.00, covering, <u>inter alia</u>, men's cotton shirts. Importer maintained that apparel at issue is properly classified under HTSUS subheading 6107.91.00, or subheading 6107.21.00, as sleepwear. Following trial, the United States Court of International Trade, Eaton, J., held that Customs properly classified apparel under HTSUS subheadings 6103.42.10 and 6105.10.00 as men's cotton trousers, shorts, and shirts.

[Judgment entered for Defendant.]

Decided: August 10, 2001

*Peter S. Herrick*, for Plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General of the United States; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Bruce N. Stratvert*), for Defendant.

## MEMORANDUM OPINION

**EATON, JUDGE:** Before the Court is a customs classification dispute that was tried <u>de</u>

novo pursuant to 28 U.S.C. § 2640(a) (1994). Plaintiff International Home Textiles, Inc.

("Plaintiff") challenges the United States Customs Service's ("Customs") classification of certain

men's garments under subheadings 6103.42.10 and 6105.10.00 of the Harmonized Tariff

Schedule of the United States ("HTSUS") (1998), 19 U.S.C. § 1202 (1994).[1] The Court

exercises exclusive jurisdiction over this matter, see 28 U.S.C. § 1581(a) (1994), and, based on

the findings of fact and conclusions of law set forth below, enters judgment for the United States

("Government") pursuant to USCIT Rules 52(a) and 58.

---

[1]     HTSUS subheading 6103.42.10 covers, inter alia, men's cotton trousers, breeches, and shorts. Subheading 6105.10.00 covers, inter alia, men's cotton shirts. The relevant statutory language reads as follows:

| | | |
|---|---|---|
| 6103 | Men's or boys' suits, ensembles, suit-type jackets, blazers, trousers, bib and brace overalls, breeches and shorts (other than swimwear), knitted or crocheted:  Trousers, bib and brace overalls, breeches and shorts: | |
| . . . . | | |
| 6103.42 | Of cotton: | |
| 6103.42.10 | Trousers, breeches and shorts........... ........ | 16.7% |
| | Trousers and breeches: | |
| 20 | Men's................(347) doz.  v  kg | |
| . . . . | | |
| | Shorts: | |
| 50 | Men's................(347) doz.  v  kg | |
| . . . . | | |
| 6105 | Men's or boys' shirts, knitted or crocheted: | |
| 6105.10.00 | Of cotton................................................. ....... | 20.5% |
| 10 | Men's................................(338) doz.  v  kg | |

HTSUS headings 6103, 6105.

## BACKGROUND

The single entry at issue here consists of men's pants, shorts, and tops, imported in September 1998 through the port of Miami, Florida. Plaintiff is the importer of record. Customs liquidated the subject merchandise on March 26, 1999, classifying it as follows: (1) the pants, as "[t]rousers," "[o]f cotton," "[m]en's," under HTSUS subheading 6103.42.1020, at 16.7% ad valorem; (2) the shorts, as "[s]horts," "[o]f cotton," "[m]en's," under HTSUS subheading 6103.42.1050, at 16.7% ad valorem; and (3) the tops, as "shirts, knitted or crocheted," "[o]f cotton," "[m]en's," under HTSUS subheading 6105.10.0010, at 20.5% ad valorem. Plaintiff timely protested liquidation, which protest Customs denied on August 9, 1999.

Thereafter, Plaintiff commenced suit, contending that the subject merchandise should have been classified "under HTSUS subheadings [sic] 6107.91.00 or 6107.21.00 as sleepwear" (Compl. ¶¶ 12, 18, 24; see also Pl.'s Pretrial Mem. at 3; Tr. at 4–5),[2] at 9.1%, or 9.3%, ad

---

[2] HTSUS heading 6107 encompasses, inter alia, men's underpants, briefs, nightshirts, pajamas, bathrobes, dressing gowns, and similar articles. Subheading 6107.21.00 covers nightshirts and pajamas, and subheading 6107.91.00, the so-called "residual provision," covers other, similar articles, including sleepwear. The pertinent statutory language reads as follows:

| 6107 | Men's or boys' underpants, briefs, nightshirts, pajamas, bathrobes, dressing gowns and similar articles, knitted or crocheted: | | | |
|---|---|---|---|---|
| . . . . | | | | |
| | Nightshirts and pajamas: | | | |
| 6107.21.00 | Of cotton............................. | ........ | | 9.3% |
| 10 | Men's.........................(351) | doz. kg | v | |
| . . . . | | | | |

valorem, respectively. Plaintiff relies primarily on the holding of International Home Textile, Inc. v. United States, 153 F.3d 1378 (Fed. Cir. 1998) ("Int'l Home II"), aff'g 21 CIT 280 (1997) ("Int'l Home I") (collectively "Int'l Home"), a case where it was both plaintiff and appellant. Plaintiff maintains that it has, since the resolution of that prior matter, redesigned its men's pants, shorts, and tops, such that they now have the essential character of being for the private activity of "sleeping; and, perhaps sipping a cup of coffee and reading a newspaper in the privacy of one's home." (Pl.'s Pretrial Mem. at 2.) Specifically, Plaintiff claims that its men's garments are now "of such lightweight material and looser fit that persons would feel uncomfortable and ill at ease by wearing the garments outdoors and in public view" (id.), and that "[t]hey would not want to wear these garments while exercising outdoors or away from home" (id.). Plaintiff further states that its garments are "advertised, marketed and displayed in the men's sleepwear/underwear sections of retail stores." (Id. at 3.) In sum, Plaintiff maintains that the garments at issue "are sleepwear and not outerwear." (Id.)[3]

---

| | | Other: | | | |
|---|---|---|---|---|---|
| 6107.91.00 | | Of cotton........................................ | ........ | | 9.1% |
| | 30 | Sleepwear...................(351) | doz. | v | |
| | | | kg | | |

HTSUS heading 6107.

---

[3]  Plaintiff, in its complaint, also alleges that Customs "made additions to the transaction value of the merchandise" (Compl. ¶ 29) for which there existed no statutory basis (Compl. ¶ 30). The Government states in its answer that "the additions to value for the hangers was included in the invoiced value and was not added by Customs." (Answer ¶ 29.) Plaintiff, however, has failed to pursue this claim. Consequently, the Court cannot and does not address it.

The Government, on behalf of Customs, counters that the merchandise at issue is "loungewear" (Def.'s Pretrial Mem. at 3),[4] that is, that the merchandise is "of the same kind" as that at issue in International Home (see id.), and, hence, is "suitable for wear outdoors and in public view, for wear while exercising outdoors or away from home, and for wear for informal entertaining" (id.; see also Tr. at 6). Thus, the Government claims, Customs properly classified the garments under HTSUS headings 6103 and 6105.

### STANDARD OF REVIEW

The proper classification of imported goods is, ultimately, a question of law, see, e.g., Univ. Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997), one which the court reviews de novo. See 28 U.S.C. § 2640(a) ("The Court of International Trade shall make its determination upon the basis of the record made before [it].").[5]

---

[4]    The parties in International Home stipulated that the garments then at issue were "properly considered loungewear, primarily used inside the home and around the house." Int'l Home I, 21 CIT at 281. Plaintiff declined to so stipulate here.

[5]    While Customs' classification "decision" is, by statute, "presumed to be correct," see 28 U.S.C. § 2639(a)(1), this presumption has been found to be "a procedural device that is designed to allocate, between the two litigants to a lawsuit, the burden of producing evidence in sufficient quantity." Univ. Elecs., 112 F.3d at 492. Specifically, the presumption places upon the importer the burden of producing sufficient evidence to show by a preponderance of the evidence that Customs' classification decision is erroneous. See id.; see also Hawley & Letzerich v. United States, 19 C.C.P.A. 47, 55 (1931).

Moreover, the presumption, in effect, attaches only to disputed questions of fact. See Univ. Elecs., 112 F.3d at 493 ("Because the presumption relates to the presentation of evidence . . . it has force only as to factual components of [Customs'] decision (i.e., components where evidence is required)."); 3G Mermet Fabric Corp. v. United States, 25 CIT __, __, 135 F. Supp. 2d 151, 155 n.8 (2001); cf. Rollerblade, Inc. v. United States, 112 F.3d 481, 484 (Fed. Cir. 1997) (finding presumption "irrelevant" where there exists no factual dispute); Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995). It "carries no force as to questions of law." Univ. Elecs., 112 F.3d at 492. Thus, "[w]hen viewed from the perspective of standards of

## DISCUSSION

The resolution of a classification question is a two-part inquiry.  See Univ. Elecs., 112

F.3d at 491.  The court must: (1) ascertain the proper meaning of the relevant tariff provision(s);

and (2) determine whether the merchandise at issue falls within the description of such

provision(s) as properly construed.  Id.  The first question is one of law; the second, one of fact.

Id.; see Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1391 (Fed. Cir. 1994).


The primary question of law arising from the facts now before the Court is the proper

construction of HTSUS heading 6107.  This question has been addressed by this court and the

Federal Circuit in a case that, as noted above, involved the classification of men's loungewear

previously imported by Plaintiff.  See Int'l Home, 21 CIT 280, aff'd, 153 F.3d 1378; see also

Inner Secrets/Secretly Yours, Inc. v. United States, 19 CIT 496, 885 F. Supp. 248 (1995); St. Eve

Int'l, Inc. v. United States, 11 CIT 224 (1987); Mast Indus., Inc. v. United States, 9 CIT 549

(1985), aff'd, 786 F.2d 1144 (Fed. Cir. 1986); see generally United States v. Carborundum Co.,

536 F.2d 373 (C.C.P.A. 1976).


In International Home, Plaintiff claimed that the men's loungewear at issue was properly

classified as "similar articles" under HTSUS heading 6107, see Int'l Home II, 153 F.3d at 1380,

specifically, either under subheading 6107.91.00 or subheading 6107.21.00.  See Int'l Home I, 21

CIT at 280–81.  This court held that each of the named exemplars listed under heading 6107, that

is, "[m]en's or boys' underpants, briefs, nightshirts, pajamas, bathrobes, [and] dressing gowns,"

review, . . . in classification disputes neither th[e Federal Circuit] nor the Court of International
Trade defers to Customs' decisions, whether factual or legal."  Id. at 493.

HTSUS heading 6107, is "characterized by a sense of privateness . . . or private activity." Id. at

282. The court further found that the loungewear items at issue did not possess this essential

characteristic of privacy and, thus, were not properly classified under either HTSUS subheading

6107.91.00 or 6107.21.00. See id. The Federal Circuit affirmed, agreeing that the essential

characteristic of the listed exemplars is that, "in their principal use [they] evoke a sense of

privacy." Int'l Home II, 153 F.3d at 1381. In so holding, the Federal Circuit accepted this

court's conclusion that Customs had properly classified the garments because it would not be

inappropriate for them to be worn

> at informal social occasions in and around the home, and for other
> individual, non-private activities in and around the house – e.g.,
> watching movies at home with guests, barbequing at a backyard
> gathering, doing outside home and yard maintenance work,
> washing the car, walking the dog, and the like.

Int'l Home I, 21 CIT at 282. See Int'l Home II, 153 F.3d at 1381 (concurring that HTSUS

heading 6107 "is indeed limited to garments for private uses").

Thus, the proper construction of HTSUS heading 6107 is settled law. The question

essential to determining whether the garments at issue fall within this heading, then, is the same

as that in International Home, i.e., whether it would be "unusual or inappropriate to wear the

[garments at issue] during informal social occasions and at other, non-private occasions,

including outside the home." Id.; see also Carborundum, 536 F.2d at 377. The Court, having

heard the testimony of the witnesses, including that of three experts, and having carefully

examined the exhibits, particularly the garments themselves, see Mast, 9 CIT at 552 (noting that

"merchandise itself may be strong evidence of use"), concludes that the garments at issue are

appropriate for wear during informal social and other, non-private occasions in and outside the

home, and, therefore, are properly classified under HTSUS subheadings 6103.42.10 and 6105.10.00.

### I.  Findings of Fact

The garments at issue (Def.'s Ex. S(1), S(2), S(3)) are made of 100 percent cotton, and, with the exception of the top (which has a contrasting heather gray placket), are solid navy blue in color.  The pants have an elastic waistband with a drawstring made of the same fabric as the garment itself, side seam pockets, and elastic cuffs at the bottom of the pants legs.  The shorts also have an elastic waistband with the same self-fabric drawstring and side seam pockets.  Neither garment has a fly front opening.  The top, referred to by the parties as a "Henley" (see, e.g., Tr. at 11:15; Tr. at 31:22), has a rib neck collar, short sleeves with rib cuffs, a back drop, two side vents, and a three-button front placket.  All three garments bear the label "Knightsbridge."  None of the garments is embellished by print or design.  In sum, these garments are virtually indistinguishable from garments designed, marketed, and sold to be worn both inside and outside the home, on casual occasions and for other, non-private activities in and around the home.  (See generally Def.'s Ex. T(1), T(2), T(3); Def.'s Ex. U(6), U(7), U(8), U(9); see, e.g., Def.'s Ex. R2; Def.'s Ex. W2; Def.'s Ex. X2; Def.'s Ex. Y2.)

As a preliminary matter, the Court notes that Plaintiff was unable show that the garments at issue were, in fact, designed as sleepwear.  Ms. Jan Leber, Plaintiff's chief designer, and the designer of the garments at issue (see Pretrial Order, Schedule G-1, at 14), testified as follows with respect to the shorts:

> Q: Was it your intent to make it look like athletic shorts? -- A: No.
> Not particularly. . .
> Q: Did you design it to look like pajamas? -- A: Just a short leg,
> yeah, like a pajama pant, but that was [sic] just a short leg instead
> for warm weather, or for people who don't like to wear long pants.
> Q: But when you designed that particular garment there, the short
> one, were you using any kind of model garment as sort of to copy
> [sic], to model after? -- A: Well, there was no particular garment in
> mind, other than the fact that we wanted to have a soft comfortable
> waist, and a roomy fit in the seat and hip, and adequate room in the
> rise.

(Tr. at 113:20–25, 114:1–10.) To the contrary, the Government's expert witnesses, Professor Donna Gustavsen, Acting Department Head of the Apparel Design Department of the Rhode Island School of Design (see Def.'s Ex. S3), and Ms. Marion Holmes, an independent contractor involved for over thirty years in the design, manufacture, marketing, and sale of men's apparel (see Def.'s Ex. T3; Tr. at 258–60), concluded that the garments at issue were likely adapted from athletic garments or other casual outerwear. (See, e.g., Tr. at 191:5–8 (finding that garments at issue and various athletic garments to which they were compared "were extraordinarily similar, and . . . that the styling for the International Home Textile garments may have been derived from an athletic inspiration"); Tr. at 193:22–24 (finding "inclusion of elastic plus a drawstring . . . an extremely athletic detail"); Tr. at 345:24–25 ("They're knock-offs of activewear and they're designed for multiuse."); see also Tr. at 210–14 (summarizing manner in which fabric, construction, and design of garments at issue are comparable, indeed, almost identical, to athletic garments in general).) Indeed, Plaintiff failed to establish the existence of any of the alleged features in design or construction which, it claims, render the garments at issue appropriate only for private activity, namely: (1) their construction from a lightweight fabric; and (2) their allegedly oversized fit. The Court finds convincing on these design issues the testimony of the Government's expert witnesses.

As to the fabric used in the construction of these garments, the Court finds that, while it is lightweight, it is not, as maintained by Plaintiff, "translucent." (See Tr. at 22:22.) Professor Gustavsen observed:

> The fabric is opaque. It is not transparent fabric. It's totally opaque. . . . However, if you hold the fabric up to the light it would be different. However, it's not transparent, and there's nothing about the fabric that makes it so light as to be unwearable outside of the home, or outside of the bedroom, in particular.

(Tr. at 208:11–18; see also Tr. at 194:25, 195:1–2 ("[The fabric is] not so light weight [sic] that [it] would . . . [be] impossible to wear [these garments] outdoors, or [during] any of the activities that we talked about.").) Plaintiff's claims to the contrary are, in any event, refuted by the Court's observation of the garments themselves, which were worn by Plaintiff's model during the trial.

With respect to the garments' allegedly oversized construction, the Court finds this claim unsubstantiated. First, the Government introduced at trial three poster boards prepared by Professor Gustavsen (Def.'s Ex. T(1), T(2), T(3)) which adequately disprove this claim. These exhibits compare the specification sheets for the pants, shorts, and top at issue to the specifications of, respectively, a pair of Russell Athletic pants (Def.'s Ex. P2), a pair of Nike shorts (Def.'s Ex. Q2), and a Basic Equipment Henley top (Def.'s Ex. O2). Professor Gustavsen purchased these items, respectively, at The Sports Authority, Modell's, and Walmart. Her comparisons, as reflected by these exhibits and in her accompanying testimony, demonstrate that the garments at issue are not significantly more "oversized" than athletic apparel. (See, e.g., Tr. at 192:17–20 (concluding that there exists "no basis for saying that the International Home Textile [pants] were actually oversized or larger than a normal athletic pant would be"); Tr. at

196:5–6 ("If anything, the Nike short was oversized more so than the International Home [sic]."); Tr. at 201:25, 202:1 (finding, upon comparison of Henley top at issue and that purchased, that "measurements were very very close and the construction were [sic] also very close as well").) Ms. Holmes also prepared poster boards (Def.'s Ex. U(6), U(7), U(8), U(9)) displaying the specification sheets of the garments at issue, as well as those of various items of what she deemed to be activewear or sportswear. Ms. Holmes concluded, in light of these comparisons, that there existed "no evidence that [the garments at issue] were exceptionally loose fitting or offered any more comfort than any other activewear style." (Tr. at 281:7–8.) In fact, Ms. Holmes testified, "[l]oose fit, comfort fit today, is a term that's used all over the market. It applies to everything that's being made now in sportswear." (Tr. at 278:21–23; see also Tr. at 347–48.) Professor Gustavsen, too, indicated little support for "the theory that being oversized is necessarily indicative of a sleepwear requirement" (Tr. at 192:22–23), and thus "question[ed] the validity of using that strategy for categorizing [garments] as sleepwear" (Tr. at 193:1–2).

The physical characteristics of the garments do indeed suggest that the consumer would deem it appropriate to wear these garments during informal social and other, non-private occasions in and outside the home. (See, e.g., Tr. at 194:11–13 (containing Professor Gustavsen's opinion that inclusion of pocket "tie[s] back to a recognizable garment that most men would recognize as being an athletic [sic] derived garment"); Tr. at 209:10–20 (wherein Professor Gustavsen stated that drawstring and pockets are "design elements that tie these garments into what is a recognizable athletic context," such that "the consumer . . . perception . . . [is that they are] athletic based, . . . that [one] is able to wear them comfortably in [sic] a number of different activities").) Again, the Court's observation of the garments, as worn by

Plaintiff's model, is perhaps the most telling evidence in support of this finding. The Court saw nothing in the design (and, as previously noted, the fabric) of the garments that would prevent them from being worn in informal social settings inside or outside the home.

Moreover, the channels of trade in which these garments moved further suggest that they were intended for wear during activities other than sleeping. For example, Ms. Leber testified that Plaintiff sells its merchandise to "underwear/loungewear buyers" (see Tr. at 98:8–10), as well as "sleepwear/loungewear buyers" (see Tr. at 102:20–21), affiliated with various mass merchants. Plaintiff's expert witness, Mr. Joel Freedman, a buyer for Kmart stores who purchased Plaintiff's garments, stated on cross-examination that he did not buy goods for a "sleepwear" department, rather, the areas he bought for were "[u]nderwear and loungewear, two separate departments" (Tr. at 183:13), and that, at Kmart, sleepwear and loungewear are sold in the same vicinity (see Tr. at 182–82). The Government also produced evidence and testimony tending to show that Plaintiff's parent company is recognized, at least during a prominent trade show (Tr. at 289–90), as one which deals in apparel for "casual lifestyles" (see Tr. at 291:11–12; Def.'s Ex. X3).

Furthermore, the evidence adduced at trial with respect to environments of sale, including methods of advertising and display, was equivocal, at best. Plaintiff's evidence on these issues consisted of, inter alia, a retail store floor plan, hangtags, photographs, and advertisements. None of these exhibits proved to be probative. First, the floor plan (Pl.'s Ex. 12), which, according to Mr. Freedman, portrays the "traditional layout for men's wear at Kmart" (Tr. at 154:7), fails to show where the merchandise at issue was actually displayed; indeed, it is entitled "Summer

2001" (see Pl.'s Ex. 12; see also Tr. at 168:18 (acknowledging that floor plan depicts "a current display")).

Second, the hangtags introduced by Plaintiff (Pl.'s Ex. 7; Pl.'s Ex. 11) also fail to demonstrate how the garments at issue were actually displayed or marketed for sale. There exists no evidence to suggest that the garments at issue were actually marketed with these, or similar, hangtags. Nor did Plaintiff successfully show that any of the garments at issue were presented for sale with, or accompanied on display by, any type of "sleepwear" hangtag. The Government, however, introduced into evidence almost identical garments imported by Plaintiff in January 1999 (Def.'s Ex. S2(1), S2(2)), each of which bears a "Knightsbridge" hangtag that reads, in part, "[f]or the man who takes his loungewear seriously" (see id.). Ms. Roslyn Haynes, an import specialist employed by Customs for thirty years (Tr. at 363:20–22), observed that these garments, while part of a different entry, are "materially the same" (Tr. at 358:18–19) as those at issue.

Third, the sixteen pictures produced by the parties as a collective exhibit (Def.'s Ex. E), which purport to depict the garments at issue on display at Target stores, were also largely unprobative. Mr. Jaime Grosfeld, Vice President of International Home Textiles, Inc., for instance, denied that the garments depicted in any of these pictures were those of Plaintiff.[6] Moreover, none of the garments depicted in these pictures appear to bear the Knightsbridge label

---

[6]     Although the Government claimed that most of these pictures were submitted by Plaintiff with its responses to the Government's interrogatories (see Tr. 55:8–10), it appears that only four pictures (Def.'s Ex. E(13), E(14), E(15), E(16)) were, in fact, submitted by Plaintiff (see Pl.'s Ex. 6).

found on the garments at issue. Three pictures depict tops and pants, displayed on floor stands, bearing the "Honors" label and hangtag. (Def.'s Ex. E(14), E(15), E(16).) These pictures show the "Honors" brand garments displayed in the same general vicinity as men's robes, underwear, ties, and belts. Also posted in the vicinity of the "Honors" brand garments is a poster promoting the "Honors" brand long sleeve Henley as "loungewear." (See Def.'s Ex. E(14).) In any event, neither party established that the "Honors" brand garments on display are the garments at issue here. Likewise, the garments depicted in ten of the remaining pictures are clearly displayed for sale along with signs that promote them as "loungewear." (See Def.'s Ex. E(1), E(2), E(3), E(4), E(5), E(6), E(7), E(9), E(10), E(12).)

Finally, with respect to advertising, Plaintiff could produce little evidence as to how the garments at issue were actually advertised, much less that they were, in fact, advertised as "sleepwear" or for use solely during private activities. While Plaintiff did introduce into evidence three advertisements placed in Kmart sales circulars (Pl.'s Ex. 4; Pl.'s Ex. 13; Pl.'s Ex. 14), only one of these ads (Pl.'s Ex. 4) was identified by any of Plaintiff's witnesses as depicting the garments at issue.[7] However, the scene depicted in this ad is, again, equivocal: a man, barefoot, wearing the top and pants at issue, leaning against an unadorned chest of drawers inside a stark room, close to a chair and a large open window. No words or phrases, other than the

---

[7] One of the two remaining advertisements produced by Plaintiff depicts garments advertised under the banner, "Sale! All men's sleepwear." (Pl.'s Ex. 13.) However, this ad does not include photos of any of the garments at issue. (See id.; see also Tr. at 16:19–22.) The other advertisement does include a photo of a top and shorts strikingly similar to those at issue, but promotes them with the phrase "all men's loungewear 100% cotton." (Pl.'s Ex. 14; see also Tr. at 159:22–24 (wherein Mr. Freedman acknowledges that "the all men's loungewear" is the merchandise that is the subject of the instant action).)

"Knightsbridge" name, are placed on the ad. (See Pl.'s Ex. 4.) Moreover, the Court notes that this ad is dated July 1999, and that Plaintiff failed to establish that this particular advertisement was used to promote the garments at issue. In fact, another of Plaintiff's submissions refers to this advertisement as one pertaining to different entries. (See Pl.'s Ex. 1, at 3 & Ex. C.) The Government, on the other hand, was able to produce much advertising showing garments that, according to their visual presentation, are nearly identical to those at issue, promoted for use for activities other than sleeping. (See, e.g., Def.'s Ex. G; Def.'s Ex. H; Def.'s Ex. I.)

Finally, returning to the garments themselves, while it is recognized that they may, seemingly, be worn while sleeping (and no doubt are worn for that purpose), the Government's experts concluded, as does the Court, that nothing would prevent them from being worn at informal social occasions inside or outside the home. (See, e.g., Tr. at 194:16–20 ("Could it be worn for sleeping, yes, it could. . . . But to say it's only worn as a sleep garment or primarily worn as a sleep garment, I don't find that to be truly credible."); Tr. at 206:3–11 (stating that garments at issue "are actually multiuse garments and can be worn in different capacities"); Tr. at 208:24–25, 209:1 ("I don't find any qualities in these garments which would limit their use to be worn [sic] in the bedroom, or a totally intimate setting."); Tr. at 344:11 (asserting that "primary use is not private"); Tr. at 345:17–25 (concluding that garments at issue are "multiuse").) Thus, the Court was presented with expert testimony and exhibits which, together with its own observation of the garments themselves, are sufficient to demonstrate that the garments at issue simply do not posses that "sense of privateness . . . or private activity," Int'l Home I, 21 CIT at 282, that would permit them to be properly classified as sleepwear.

**II.  Conclusions of Law**

HTSUS heading 6107 is "limited to garments for private uses."  Int'l Home II, 153 F.3d at 1381.  In light of the factual findings set forth above, the Court further concludes that the garments at issue do not share the essential characteristic of merchandise properly classified under HTSUS heading 6107, that is, garments whose principal use relates to private activity.  Plaintiff has failed to prove that it is "unusual or inappropriate to wear the [garments] at issue during informal social occasions and at other, non-private occasions, including outside the home," id., while the Government has established evidence sufficient to support classification under HTSUS headings 6103 and 6105.

**CONCLUSION**

Thus, in accordance with the foregoing findings and conclusions, the Court ultimately concludes that the garments at issue are properly classified under HTSUS subheadings 6103.42.10 and 6105.10.00.  Judgment is entered accordingly.

 

 

_____
Richard K. Eaton, Judge

Dated:  August 10, 2001
            New York, New York