**SEARS ROEBUCK & CO.,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–**
**Appellant.**

**No. 93–1061.**

United States Court of Appeals,
Federal Circuit.

April 8, 1994.

Rehearing Denied June 1, 1994.

City, argued for defendant-appellant. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen., Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office. Also on the brief was Steven Berke, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, of counsel.

Before NIES,* NEWMAN, and SCHALL, Circuit Judges.

NIES, Circuit Judge.

The United States appeals from the judgment of the Court of International Trade holding that the merchandise imported by Sears Roebuck and Company, invoiced as "color video sound camera[s] (video camera & recorder)" and commonly known as "camcorders," is properly classified under item 685.40 of the Tariff Schedules of the United States (TSUS), covering "tape recorders." The government argues that the merchandise is properly classified under item 685.49 TSUS as a combination article consisting of a television camera and tape recorder. We agree and, accordingly, we reverse.

## I.

Sears is an importer of camcorders, versatile, portable cameras which are able to record scenes and sound on video tape cassettes. The United States Customs Service (Customs) initially classified the camcorders under item 685.49 of the TSUS as a combination article consisting of a television camera and tape recorder.[1] Sears challenged this classification before the Court of Internation-

Donald J. Unger, Barnes, Richardson & Colburn, Chicago, IL, argued for plaintiff-appellee. With him on the brief was Brian F. Walsh.

Nancy M. Frieden, Atty., Commercial Litigation Branch, Dept. of Justice, New York

---

\* Circuit Judge Nies vacated the position of Chief Judge on March 17, 1994.

1. TSUS Schedule 6, Part 5 provided for:

Radiotelegraphic and radiotelephonic transmission apparatus; radiobroadcasting and television transmission and reception appara-

tus, and television cameras; record players, phonographs, tape recorders, dictation recording and transcribing machines, record changers, and tone arms; all of the foregoing, and any combination thereof, whether or not incorporating clocks or other timing apparatus, and parts thereof:

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| * |  |  | * | * |  |  |
| Other |  |  |  |  |  |  |
|  |  | * | * | * |  |  |
|  | Other |  |  |  |  |  |
|  |  | * | * | * |  |  |
|  | Other |  |  |  |  |  |
|  |  | * | * | * |  |  |
| 685.49 |  | Other | ....................... 5.2% *ad val.* |  |  |  |

al Trade on the grounds that the devices contained neither a television camera nor a tape recorder as those tariff items were commonly known at the time TSUS 685.49 was enacted in 1962.[2] In its initial decision, *Sears Roebuck and Co. v. United States*, 790 F.Supp. 299 (Ct. Int'l Trade 1992), the court held that the camera in the camcorder was not a "television" camera. The court reasoned that television cameras must be used in connection with television broadcast transmission apparatus for transmitting electrical waves over a distance. Because the court concluded that camcorders were not designed for this purpose, but instead to replace home movie cameras, it held that Customs erred in classifying the goods under TSUS 685.49. The matter was remanded to Customs for a second determination. *Id.* at 302.

On remand, Customs classified the camcorders under TSUS 685.40 as "tape recorders."[3] On return of the matter to the trial court, neither party supported that classification. Sears advised the court, however, it would not challenge the classification because the tariff rate was no higher than its preferred classification, as an "electrical article not specifically provided for" under TSUS 688.42. The government continued to urge its original classification and insisted that camcorders were more than "tape recorders."

In its second decision concerning this dispute, the court upheld the classification of camcorders as "tape recorders." *Sears Roebuck and Co. v. United States*, No. 92–148, slip op. at 3, 1992 WL 220838 (Ct. Int'l Trade Aug. 28, 1992). The court reasoned that the existence of TSUS 724.12, a provision specifi-

cally recognizing "magnetic video tape," indicated congressional awareness that images could be recorded on tape. The court also held that classification was governed by the camcorder's primary purpose—"to produce a tape of what appears before the lens"—and not by its subordinate capabilities, such as live monitoring without recording. Based on these conclusions, the court held that Congress intended camcorders to fall under the "tape recorders" provision. *Id.* at 4. The government appeals.

## II.

We initially note Sears' contention that the United States may not assert in this appeal that the classification of camcorders as "tape recorders" is improper. According to Sears, because Customs submitted the tape recorder classification to the trial court following remand, the United States should not now be permitted to attack this classification before this Court. We disagree.

A party may challenge an interlocutory decision of a trial court on appeal from the final judgment. *Flanagan v. United States*, 465 U.S. 259, 263, 104 S.Ct. 1051, 1053–54, 79 L.Ed.2d 288 (1984). As explained below, the prior decision of the trial court remanding the case was interlocutory and not appealable. Thus, this appeal provides the government's first opportunity to challenge an initial decision which rejected the TSUS 685.49 classification.

Under 28 U.S.C. § 1295(a)(5), an appeal may be taken only from "a final decision of the United States Court of International Trade."[4] Except in unusual circumstances,

---

2. The parties do not dispute that camcorders were introduced into the United States market in the 1980s, subsequent to the passage of the TSUS through the Tariff Classification Act of 1962, Pub.L. No. 87–456, 76 Stat. 72 (1962), *repealed by* Harmonized Tariff Schedule of 1988, Pub.L. No. 100–418, 102 Stat. 1148 (codified at 19 U.S.C. § 1202 (1988)). However, "[t]ariff terms are written for the future as well as the present, meaning that tariff terms can be expected to encompass merchandise not known to commerce at the time of their enactment, provided the new article possesses an essential resemblance to the one named in the statute." *United States v. Standard Surplus Sales, Inc.*, 667 F.2d 1011, 1014, 69 CCPA 34 (1981) (citations omitted).

3. Item 685.40 provided for:
   Radiotelegraphic and radiotelephonic transmission and reception apparatus: ... Tape recorders ... and parts thereof......................4.1% ad val.

4. We note that 28 U.S.C. § 1292(d)(1) provides a statutory exception to the final judgment rule by allowing a judge of the Court of International Trade to certify an otherwise unappealable order. This Court, in its discretion, may then permit an interlocutory appeal. *See Cabot Corp. v. United States*, 788 F.2d 1539, 1543 (Fed.Cir.1986). Nothing requires the government to attempt to invoke § 1292, however, to preserve a right to appeal an adverse ruling.

a remand to Customs does not meet the requirement of finality and thus is not appealable. *See Cabot Corp. v. United States,* 788 F.2d 1539, 1542 (Fed.Cir.1986). To determine "whether an order is final enough to be appealable," *Heat & Control, Inc. v. Hester Indus., Inc.,* 785 F.2d 1017, 1020 (Fed. Cir.1986), we must examine the standard set forth in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). As later described in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457–58, 57 L.Ed.2d 351 (1978), the *Cohen* test requires that an appealable order meet three conditions:

> [T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.

*See also Sullivan v. Finkelstein,* 496 U.S. 617, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990); *Travelstead v. Derwinski,* 978 F.2d 1244 (Fed.Cir.1992).

These standards were not met by the remand order of the trial court in this case. The remand order effectively left the camcorders unclassified, an issue which goes to the heart of the merits of this action. As the United States could not have mounted an appeal from the remand order of the trial court, its arguments are properly addressed by this Court on this appeal.

■ Such a holding comports with 28 U.S.C. § 2643(b), which empowers the Court of International Trade to employ a number of different mechanisms when determining the proper classification of merchandise under the customs laws, including examining the law on its own initiative, remanding the matter to Customs, and scheduling a retrial. *See Jarvis Clark Co. v. United States,* 733 F.2d 873 (Fed.Cir.1984). The trial court's choice of procedure does not constrain the ability of Customs to continue to assert that the agency's initial classification was correct. Having been instructed by the trial court that a camcorder was not properly classified as a combination television camera and tape recorder, Customs adopted the tape recorder classification as a fallback position. Al-

though Sears argues that it was misled by this "litigation tactic," the record is to the contrary. Even as Customs proposed its "tape recorder" classification on remand in a June 11, 1992, letter to the Court of International Trade, it clearly stated its reservation of a right to appeal the court's decision:

> Finally, we note for purposes of appeal (should an appeal be taken from a final judgment of this Court), the Government continues to assert the original classification is correct. By submission of this proposed alternative classification, the Government does not waive its right of appeal.

Sears acknowledged the Government's position in a June 25, 1992, letter to the trial court, stating that:

> Sears reserves its right to defend the Court's entry of a final judgment under either of the provisions discussed above in the case before the Court of Appeals for the Federal Circuit should an appeal be pursued by the defendant.

We can only conclude from these exchanges that Sears was not led to believe that Customs abandoned or waived its original classification. This Court has held, in analogous circumstances concerning judicial review of a Customs decision, that the acknowledged reservation of a party's right to appeal mitigates against a holding of estoppel. *See Trayco, Inc. v. United States,* 994 F.2d 832, 839 (Fed.Cir.1993). We now turn to the merits of this appeal.

### III.

#### A.

■ A determination of the meaning of a tariff term is a question of law, reviewed *de novo. Digital Equip. Corp. v. United States,* 889 F.2d 267, 268 (Fed.Cir.1989). Because no clearly stated congressional intent provides the meaning of the tariff terms at issue in this appeal, we may construe the terms according to their common meaning. *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed.Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). This meaning may be based upon our "own understanding of the terms used," assisted by consideration of "lexicographic and scientific au-

thorities, dictionaries, and other reliable information sources." *Id.* The determination of whether an article falls within the definition is a question of fact. *Daw Indus. v. United States*, 714 F.2d 1140, 1142 (Fed.Cir. 1983). In this case, however, it is undisputed that the definition of a television camera urged by Customs *ipso facto* covers the camera portion of a camcorder.

The government urges that a television camera requires simply a lens, a pickup device and electronic circuitry which converts the images into electric signals. There is no dispute that camcorders meet this definition. The trial court, however, held that a television camera requires more than the above described capabilities and structure. According to the trial court, a television camera must also be used with "television transmission apparatus for television *broadcasting* purposes." 790 F.Supp. at 302 (emphasis added). In reaching this conclusion, the court relied upon several dictionary definitions contemporary to the TSUS, including:

> Television—Vision at a distance; hence, the transmission and reproduction of a view or scene, esp. a view of persons or objects in motion, by any device which converts light rays into electrical waves and reconverts these into visible light rays.
>
> Television camera—The part of a transmitting apparatus in which the image of the scene to be televised is formed for conversion into electrical impulses.

790 F.Supp. at 301 (quoting *Webster's New International Dictionary of the English Language, Second Edition, Unabridged* (1961)). Based on its view that camcorders had to be and are not used in connection with broadcast transmission apparatus, the court held the camera portion was not a television camera. In Sears' view, the above definitions support the trial court's restricted meaning of the term "television camera," limiting the term to only those cameras directly connected to or connectable to broadcast

transmission apparatus for contemporaneous viewing at a distance.[5]

We disagree. The above authority defines a television camera as *part of* television *transmitting apparatus.* It is, however, clear that Congress did not adopt a definition of a television camera *as part of* a television transmission system. To the contrary, item 685.49 of the TSUS, which provided the superior heading for the classification of television articles, includes as *separate* items "television transmission and reception apparatus" and "television cameras." Far from suggesting that television cameras are only those cameras which *are part of* a transmission apparatus, this language recognizes a distinction between types of television equipment, namely, transmission equipment, reception equipment and cameras. Once this separation is made, the above definition (as well as others relied on) supports the government's position that a television camera need do no more than convert the captured image into electrical impulses.[6]

We additionally note that TSUS 685.49 provides for combinations of a large assortment of devices, with a combination of television transmission apparatus and cameras as merely one possibility. This possible range of combinations negates the possibility that Congress intended the term "television camera" to be inherently limited to cameras used with television transmission apparatus for live broadcasts. The literal language of the statute—"any combination thereof"—equally suggests the combination of television cameras with "tape recorders," the latter also an item in the superior heading.[7]

The broad definition of a television camera proposed by the government is consistent with uses actually made of such cameras in the 1960's, including "studio" cameras which everyone agrees are television cameras. The trial court's view, which ties cameras to "broadcasting," is far too limited to encompass commonplace uses then and now of television cameras with systems other than

---

5. Although Sears asserts that a distinction lies between the terms "television" and "video," we find in the record no documentary evidence of such a difference.

6. Electrical signals produced by a television camera are not directly broadcastable. Rather, a separate device must convert such signals into carrier waves.

7. *See supra* note 1.

broadcasting systems.[8] Closed circuit television was already established at the date of the TSUS's enactment as an important use in industrial, commercial, educational and research facilities (known collectively as "industry television"). *See Television*, 21 Encyclopedia Britannica 912a, 913 (1957) (listing closed-circuit applications such as, *inter alia:* "remote observation of furnaces and gauges in power plants"; "surveillance of banking activities"; and "distribution of demonstration lectures to several classes," and noting that "[t]he term 'industrial' television has come to cover all such closed-circuit applications, in brief, virtually all forms of television apart from broadcast television."). This common use of a television camera is excluded under the court's restricted definition. However, nothing suggests that Congress intended to treat television cameras used in closed circuits differently from television cameras used in broadcasting.

Another widely prevalent use of a television camera in 1962 was to make video tape recordings. As noted in *Television*, 21 Encyclopedia Britannica 910A, 912M (1962):

> Recording of television programs on photographic film or magnetic tape is an important technique [in order] to preserve a permanent record of a live-scene program for subsequent rebroadcast.... In the U.S. many of the network programs broadcast in and west of Chicago are derived from magnetic recordings, stored for an hour or more after their release along the eastern seaboard to allow for the difference in time in western cities.

Such recorders were developed and commercialized in the late 1950's. Andrew F. Inglis, *Behind the Tube: A History of Broadcasting Technology and Business*, 323–25 (1990). Television cameras were routinely used with such recorders, *id.* at 325–26, and video recordings shortly became preferred to live broadcasts. *See Television*, 18 World Book Encyclopedia 87, 94 (1969) ("Filmed shows have largely replaced live telecasts in recent years."). The ubiquitous reruns provide ample testimony of recordings. *Television*, 18 World Book Encyclopedia 87, 94 (1969). That a camera is used in connection with recording equipment, rather than transmission equipment, does not change its nature.

In 1962, portable television cameras existed as well. *Television*, 21 Encyclopedia Britannica 9210A, 912N (1962). Such cameras could be used to send signals to monitors and then to portable, satellite, or up-link transmitters. At the time of the TSUS enactment, however, portable cameras were also used with separate portable tape recorders to make video tapes. The description of television cameras in the *McGraw Hill Encyclopedia of Science and Technology* includes "portable cameras" which are "[u]sed in conjunction with modern battery powered portable video cassette recorders." 18 *McGraw Hill Encyclopedia of Science and Technology* 545 (1982). *See also* Inglis, *supra*, at 216–19 (describing portable cameras for field use developed in the early 1950's). Thus, we conclude that in both studio and field cameras, a television camera completed its function upon providing electrical image impulses for use by other equipment. The argument that television cameras required or require use directly with transmission equipment is no more viable than the argument that transmission equipment had or has to project images directly from a camera. Just as a video recording can be broadcast without changing the character of television *transmission* equipment, a *television camera* remains a television camera when the transformed images are recorded rather than further transformed and broadcast.

In sum, a television camera is a device which is able to capture a scene through a lens and to convert it into electrical impulses. Whether those impulses are used in connection with a live broadcast either through the air or by cable, or to make a recording for later viewing, or simply displayed on a TV monitor via a closed circuit does not affect the scope of the statutory term "television camera."

---

**8.** Indeed, judicial notice may be taken that television cameras existed before broadcasting systems. *See* Andrew F. Inglis, *Behind the Tube: A History of Broadcasting Technology and Business,* 158–61 (1990); *Television,* The Columbia Encyclopedia 2105, 2105 (3d ed. 1967); *Television,* 21 Encyclopedia Britannica 912A, 912A (1957).

### B.

■ With the meaning of the tariff term established, we next consider whether Customs correctly classified the merchandise as a combination television camera and recorder. (TSUS 685.49). As indicated, the term "television camera" properly defined includes the camera portion of the camcorder, which bears an essential resemblance to television cameras known at the time of the enactment of the TSUS. A camcorder camera is essentially an improved, miniaturized version of an earlier portable television camera. As with predecessor television cameras, camcorder cameras function toward the same purpose, the capturing of optical images and conversion of those images into electrical impulses. They additionally consist of the same basic elements as earlier television cameras, being fundamentally composed of a lens, pickup devices, and electrical processing and control circuitry.

Further, the camera portion of camcorders is distinctly separate from the VCR (video cassette recorder). The camera portion may be used without recording. As illustrated in the Owners Manual for the devices in issue, users can employ the camcorder to display a scene on the device's viewfinder without recording. Even more telling, the camcorder may be connected to a remote monitor and used independently of the recorder portion to view live action captured by the camera. In that mode, the electrical impulses obtained from the camera are sent to a receiver without recording. A familiar example of such use is for security surveillance purposes. *See, e.g.,* Feldman Test., J.A. at 5–103; Reichard Test. J.A. at 114–15. Such use is indistinguishable from closed circuit television of the late 1950's.

Neither party now contests that the imported camcorders *include* tape recorders. In addition to recording sight from the camera portion and accompanying sound, the VCR portion of the imported merchandise allows users to record directly from other sources, as well as to transmit and receive taped signals to and from other devices for purposes of editing, dubbing, and duplication. By connection with a television receiver, the VCR portion of the device also allows users to view prerecorded cassettes. Thus, this part of the camcorder is independent of the camera portion and is so advertised.

In view of their separate capabilities, we conclude that camcorders are combination devices with the features of cameras and tape recorders. The camcorder offers its users camera capabilities which are not subordinate to the tape recorder function of the camcorder, are independent of its tape recorder capabilities, and involve different circuitry. At the same time, the VCR portion provides the functions of a tape recorder independently of the camera portion. Thus, camcorders meet the test for a combination article. *See Digital Equip. Corp.,* 889 F.2d at 268; *Carling Elec. Co. v. United States,* 757 F.2d 1285, 1288 (Fed.Cir.1985).

■ Finally, in deciding such goods were merely tape recorders, the trial court relied on the fact that most camcorders are bought for home use, essentially replacing home movie cameras. This is an erroneous application of the principle that use may affect classification. *See Rico Import Co. v. United States,* 12 F.3d 1088, 1090 (Fed.Cir.1993). Camcorders are not improved movie cameras. They are substitutes. Their replacement of movie cameras does not affect their essential functional and structural nature.

In any event, Congress drew no distinction between television cameras used by professionals and those used by amateurs. Moreover, camcorder is a name used for both professional and consumer equipment. Inglis, *supra,* at 358 ("The combined camera-recorder units are now universally called camcorders. There are two types—low-cost consumer products . . . and professional units used by broadcasters."). Were we to adopt the trial court's view, this professional equipment, which is merely a development over the portable television cameras and portable recording units employed prior to the advent of electronic miniaturization, would be excluded. That this development has led to home use does not change the essential resemblance of camcorders to the television

equipment in use in 1962. As Sears itself tellingly advertises, a "[c]amcorder is a camera and VCR all in one" or, more tersely, that a "Camera + Recorder = Camcorder."[9]

## IV.

For the foregoing reasons, we conclude that camcorders are properly classified under TSUS item 685.49. The judgment of the Court of International Trade is reversed.

REVERSED.

9. *See also* Inglis, *supra,* at 470 ("The camcorder, a combined television camera and tape recorder, is the latest success story in consumer electronics.").