**Slip Op. 05-44**

### UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————

ZOMAX OPTICAL MEDIA, INC.,　　　　:

　　　　　　　　　*Plaintiff,*　　　:

　　　　v.　　　　　　　　　　:　　　Court No. 00-03-00104

UNITED STATES,　　　　　　:

　　　　　　　　　*Defendant.*　　:

———————————————————

[Plaintiff's motion for summary judgment granted.]

Decided:　April 1, 2005

Neville Peterson LLP (John M. Peterson and Curtis W. Knauss), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Amy M. Rubin); Sheryl A. French, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

### OPINION

RIDGWAY, Judge:

In this action, plaintiff Zomax Incorporated (formerly known as Zomax Optical Media, Inc.) challenges the decision of the U.S. Customs Service ("Customs")[1] denying Zomax's protest

_____

[1]Effective March 1, 2003, the U.S. Customs Service was renamed the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security. *See* Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. 108-32 at 4 (2003).

concerning the tariff classification of certain digital mastering equipment imported by Zomax and used for the manufacturing of CDs and DVDs.

Zomax maintains that Customs improperly classified its merchandise as "[o]ther drawing, marking-out or mathematical calculating instruments" under subheading 9017.20 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1997),[2] assessing duties at a rate of 5.1% *ad valorem*. *See generally* Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Brief"); Plaintiff's Reply to Defendant's Opposition to Summary Judgment ("Pl.'s Reply Brief").[3] Zomax argues that the merchandise is instead properly classified as a "[m]achine[ ] for the manufacturing of video laser discs," under subheading 8479.89.85 of the HTSUS, and thus should be duty-free.

Pending before the court is Zomax's motion for summary judgment.[4] The Government opposes the motion, asserting, *inter alia*, that Zomax has failed to meet its burden of proof, and that its proposed classification is impermissible. *See generally* Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Brief") at 3-4.

---

[2]All references are to the 1997 version of the HTSUS.

[3]There is some confusion as to Customs' precise classification. *Compare*, *e.g.*, Pl.'s Brief at 3 (asserting that merchandise was classified under HTSUS subheading 9017.20, providing for " . . . Other drawing, marking-out or mathematical calculating instruments . . . Other . . . Other") *with* Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Brief") at 2-3 (asserting that merchandise was classified under HTSUS subheading 9017.20.90, providing for "other *parts* of drawing, marking-out or mathematical calculating instruments") (emphasis added). In any event, the discrepancy has no effect on either the substantive classification analysis that follows, or on the result.

[4]Jurisdiction lies under 28 U.S.C. § 1581(a) (1994). Customs classification decisions are subject to *de novo* review pursuant to 28 U.S.C. § 2640.

For the reasons set forth below, the merchandise at issue in this action is properly classified as a "[m]achine[ ] for the manufacturing of video laser discs," under subheading 8479.89.85 of the HTSUS. Zomax's motion for summary judgment is therefore granted.

## I. Standard of Review

Customs classification decisions are reviewed through a two-step analysis – first, construing the relevant tariff headings (a question of law); and, second, determining under which of those headings the merchandise at issue is properly classified (a question of fact). Bausch & Lomb, Inc. v. United States, 148 F.3d 1363 (Fed. Cir. 1998) (*citing* Univ. Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997)). Summary judgment is thus appropriate where, as here, "there is no *genuine* dispute as to the underlying factual issue of what exactly the merchandise is." Bausch & Lomb, 112 F.3d at 1365 (emphasis added); *see also* USCIT Rule 56(c).

"Mere denials or conclusory statements are not sufficient" to put a material fact into dispute. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); USCIT Rule 56(e). Indeed, a factual dispute is genuine only "if the evidence is such that the [trier of fact] could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In short, "there is no issue for trial unless there is *sufficient evidence* favoring the non-moving party . . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (emphasis added) (citations omitted). Thus, at the summary judgment stage, the question presented is "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may *reasonably* be resolved in favor of either party." *Id.* at 250 (emphasis added).

## II. **Background**

### A.  The Nature of This Case

This case is an odd one, for a number of reasons.  Most striking is the peculiar procedural posture.[5]  In the typical customs classification case, the court's analysis consists largely of reviewing the competing classifications proposed by the respective parties.[6]  But this case is very different.

Here, even the Government does not contend that Customs' classification under subheading 9017.20 is proper.  Indeed, the Government not only does not defend that classification, it has expressly disavowed it.  *See*, *e.g.*, Pl.'s Brief at 2, 7, 30-31; Def.'s Brief at 7 n.7; Pl.'s Reply Brief at 1, 6, 10.  Yet the Government has declined to proffer any proposed alternative classification.  *See*, *e.g.*, Pl.'s Brief at 8; Def.'s Brief at 7 n.7; Pl.'s Reply Brief at 1, 10.[7]

---

[5]Zomax's research revealed no reported cases in the last two decades "in which the government has jettisoned the presumption of correctness, declined to introduce its own evidence, asserted no alternative classification, and yet opposed a plaintiff's dispositive motion."  Pl.'s Reply Brief at 7 n.3.

[6]*See*, *e.g.*, Toy Biz, Inc. v. United States, 26 CIT 816, 820-30; 219 F. Supp. 2d 1289, 1293-1303 (2002) (addressing whether "X-Men Projector" action figures should be classified as "dolls" or as "other toys"); Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984) (observing that, ordinarily, it will be difficult for a party to show that a classification is *incorrect* without proposing a better classification).

[7]According to the Government, Customs was "willing to consider alternative classification provisions" for the merchandise at issue, but could not do so without information as to which system components were in each of two entries – information that is, according to the Government, material (so that its absence defeats Zomax's motion for summary judgment), and information that both parties agree Zomax cannot provide.  *See* Def.'s Brief at 3-5, 7 n.7; Pl.'s Brief at 28.  But the Government's explanation is less than satisfying, and cannot fully excuse Customs' failure to proffer any alternative classification in this forum.

To be sure, the lack of information as to the contents of the two entries could present an impediment to the classification process under certain scenarios – if, for example, the Government prevailed on its argument that the two entries at issue must be classified separately.   But the Government also failed to proffer a proposed classification for any scenario where the respective contents of the two entries was irrelevant – for example, a scenario where the two entries are treated

Further, although the Government takes pains to emphasize that it is "not *formally* cross-moving for summary judgment," it requests that summary judgment be granted *sua sponte* in its favor. Def.'s Brief at 5 (emphasis added), 7. The Government also suggests, in passing, that Zomax's case be dismissed for "fail[ure] to plead or demonstrate a cause of action for which relief may be granted." Def.'s Brief at 7 n.7.; USCIT Rule 12(b)(5).[8]

However, to do as the Government urges – either to grant summary judgment *sua sponte* in its favor, or to dismiss the case – would, in effect, grant a judicial *imprimatur* to the classification of the merchandise at issue under an HTSUS provision that even Customs believes is improper. This the court cannot do. *See* 28 U.S.C. § 2643(b) (stating that the Court of International Trade has the duty to find the correct answer by appropriate means); Jarvis Clark Co., 733 F.2d 878 (asserting that "the court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand").

---

as one for classification purposes and are deemed to constitute a complete system, but where the Government prevails on its argument that CDs and DVDs are not video laser discs, and/or its argument that a machine that makes "masters" for VLDs is not a machine that "manufactures" VLDs.

[8]Such a motion will not lie here. In support of its motion to dismiss for failure to state a claim, the Government points to Zomax's discovery responses (which indicate that "Zomax has conceded that it cannot provide the identity and value of the invoiced articles"). *See* Def.'s Brief at 7 n.7. The Government thus relies on information outside the pleadings to support its motion to dismiss.

Where a motion to dismiss for failure to state a claim relies on information outside the pleadings, however, that motion is effectively converted into a motion for summary judgment – and the moving party becomes "obligated to demonstrate, in accordance with the requirements of [the rule governing summary judgment], that there exists no genuine issue as to any material fact and that [it] is entitled to the entry of a judgment as a matter of law." USCIT Rule 12(b)(5); Wright & Miller, Fed. Prac. & Proc. Civ. § 1366 (3d ed. Supp. 2005).

Finally, the parties agree that no purpose would be served by a trial in this action. *See*, *e.g.*, Def.'s Brief at 7 (citing Zomax's discovery responses). The matter is thus ripe for disposition.

### B. The History of the Statutory/Regulatory Scheme

The realities of modern merchandise and modern modes of cargo shipping can pose significant challenges for importers. One such challenge has arisen in situations where merchandise is imported in an unassembled or disassembled state, in multiple containers. Where such merchandise is capable of being transported in one conveyance, the importer will often have the shipment delivered to a carrier in the exporting country as one shipment, under one bill of lading or waybill, with the intention that the merchandise be transported to the U.S. as a single shipment. However, after taking possession of the merchandise, the carrier may divide the shipment into different lots, which may arrive in the U.S. at different times, often days apart. *See generally* Single Entry for Split Shipments, 68 Fed. Reg. 8713, 8714 (Feb. 25, 2003) (Dep't Treasury).

These so-called "split shipments" are a routine occurrence, particularly in the context of air-shipped cargo, due to practical considerations including limited cargo space, the need for proper weight distribution, and the offloading of cargo for safety concerns. But, while split shipments are a straightforward matter of logistics for *carriers*, they often created legal uncertainty and unpredictability for *importers*. *Id*. The confusion stemmed from the interplay of agency regulations concerning the *entry* of goods, and various customs doctrines governing the *classification* of goods, as well as the fact that customs classification decisions are made annually for literally millions of entries at dozens of ports scattered across the country.

For example, as in this case, Customs at some ports invoked the "condition as imported" rule to require the separate classification of shipments that were split by the carrier. In contrast, at other ports (such as Los Angeles International Airport ("LAX") and the John F. Kennedy Airport ("JFK") in New York), Customs treated split shipments as a single entry for purposes of classification. The financial repercussions for an importer could be significant where treatment as separate entries resulted in a different classification (and a higher rate of duty) than treatment of the merchandise as a single entry, as the importer had intended.

Sensitive to importers' concerns, Congress resolved the inconsistency and clarified the situation by enacting 19 U.S.C. § 1484(j)(2), providing a framework to help ensure that split shipments are consistently classified as importers intend.[9] In effect, Congress merely provided uniformity to a practice that was already in place in at least two of the busiest airports in the nation.[10]

---

[9]Congress expressed concern that, "[a]s a result of these shipping conditions, parts of entireties do not arrive together, which *causes classification or entry problems with Customs*." H.R. Rep. No. 106-789 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2102 (emphasis added).

[10]The history of Customs' implementing regulations indicates that the regulations reflect not a new practice, but – rather – an effort to make uniform a practice already in use at some ports:

> *Comment: Under the current systems for handling split shipments employed* at [LAX] and at [JFK] in New York, the carrier is required to include each split portion on the manifest. Hence, it is asserted that the manifest should constitute the advance notification to Customs that the shipment has been split. If the importer does not file a separate entry for each arriving portion, it should be understood that the importer intends to file a single entry for the entire split shipment.

> *Customs Response*: Customs disagrees. The advance notice is a statutory requirement which lets Customs know that the importer has elected to file a single entry for all portions of the split shipment. Mere notification that the shipment has been split is not notification by the importer that a single entry will be filed for the shipment.

In both of these airports, Customs had already established a system for handling split shipments. To comply with this system, the carrier was required to include each split portion on the cargo manifest. *See* Single Entry for Split Shipments, 68 Fed. Reg. 8717. Thus, Congress' action amounted to a ratification of the agency's ad hoc practice and an express authorization to the agency to consistently treat split shipments in accordance with importers' intentions.

## C. The Facts of This Case

Zomax purchased the digital video mastering system here at issue in 1997, from Nimbus Technology & Engineering, of the United Kingdom.[11] The system is used to manufacture "master" video laser discs of various formats (including DVDs, CD-roms, CD videos, and Video-CDs, among

---

*See* Single Entry for Split Shipments, 68 Fed. Reg. 8717 (emphasis added). As the Comment makes clear, and Customs never refutes, there was already a system in place that addressed split shipments.

Similarly, in the process of notice and comments that preceded the regulation that implemented 19 U.S.C. § 1484(j)(2) the following exchange took place with regards to a proposed change in the procedure which required notice to Customs that the shipment has been split:

*Comment*: The split shipment procedures followed by Customs at [LAX] and at [JFK] are preferable to those reflected in the proposed rule.

*Customs Response*: Customs reviewed the split shipment procedures at these airports. In developing the proposed regulation, Customs included the most operationally feasible features of the procedures for handling split shipments at those locations.

*See* Single Entry for Split Shipments, 68 Fed. Reg. 8714.

[11]The facts herein are drawn largely from the affidavit submitted by Zomax, together with the documents submitted by the parties.

others), which can be played on suitable players, and which, in turn, are used to produce the discs available in retail and wholesale outlets.[12]

The merchandise at issue was marketed, ordered, purchased, and sold as a single operating unit, at a single price, under a single commercial invoice covering the entire system.[13]  For reasons of transportation necessity, the system was shipped from Great Britain to the U.S. in 46 separate cartons.  All 46 cartons were tendered to the carrier as a single shipment, under a single air waybill, and were accepted for transport by the carrier on that basis.  After accepting the shipment, however, the carrier arbitrarily split the shipment – on its own initiative, and without notice to or consent from Zomax (the importer of record) – shipping the 46 boxes to the U.S. in two lots,[14] which were sent on two different flights on consecutive days.  Forty-one of the 46 cartons comprising the system arrived on the first aircraft, with the five remaining cartons delivered the following day.  It is impossible to know exactly which components were in each of the two lots.

------

[12]As Zomax explains, the master disc is topologically inverse to the discs that are molded from the master, and distributed commercially.  *See* Pl.'s Brief at 20-21.

[13]Zomax's purchase order (Pl.'s Exh. D) lists the quantity ordered as "1.000" and describes the product as "Equipment - CD Glass Master Equipment," indicating that the order was for a single mastering unit.  Similarly, the invoice Nimbus issued to Zomax (Pl.'s Exh. C) lists only the cost of the system as a whole.

[14]A single air waybill (Pl.'s Exh. E) was issued in England by the carrier.  That air waybill indicates that, while the 46 cartons containing the entire system were delivered to the carrier as a single shipment, the carrier thereafter decided to split the shipment and send it on separate flights leaving on two consecutive days.

Two airline Carrier's Certificates (Pl.'s Exh. F) confirm that a single shipment of 46 cartons was accepted for carriage under a single air waybill (#0737021741) and was split by the carrier for shipment on two different flights.

In accordance with Customs regulations, Zomax's customs broker made entry of the two lots on consecutive days, using the single commercial invoice.[15] The system was subsequently assembled at Zomax's manufacturing plant, by technicians from Nimbus, over a period of weeks.

Zomax's customs broker entered the system at issue under the provision for "[m]achines for the manufacturing of video laser discs" – subheading 8479.89.85 of the HTSUS, duty-free. Customs initially liquidated the two lots as entered. Three and a half months later, however, Customs reliquidated the two lots under HTSUS subheading 9017.20, which covers "[o]ther drawing, marking-out or mathematical calculating instruments," subject to a duty rate of 5.1%.[16]

Zomax's timely protest was denied, and this action ensued.

### III.  Analysis

The Government opposes Zomax's proposed classification on three basic grounds. The Government first contends that – because the merchandise here at issue was entered as two entries, rather than a single entry – it cannot be classified as a single machine. *See generally* Def.'s Brief at 3, 8-13. Secondly, the Government disputes that the merchandise constitutes a complete system. *See generally* Def.'s Brief at 3, 10, 18-20. Finally, the Government asserts that – even if the two

---

[15]A copy of the invoice issued by Nimbus was included with each of the two lots. The copy included with the first lot has a hand-written notation indicating that it is "pt.1" covering "41" cartons, while the copy included with second lot covers "5" cartons and is marked "pt.2." *See* Pl.'s Exh. C.

The broker apportioned the value stated on the invoice between the two lots, based on the number of cartons in each lot. *See* Pl.'s Exh. C; Pl.'s Brief at 11.

[16]*See* n.3, *supra*.

entries are combined for classification, and even if the merchandise constitutes a complete system – the merchandise still cannot be classified as Zomax proposes, because (a) "a DVD (or CD) mastering system is not a machine for the manufacture of video laser discs because DVDs and CDs are not [video laser discs]" (*see generally* Def.'s Brief at 4, 13-17), and because (b) "a machine that makes 'masters' for [video laser discs] is not the same as a machine that manufactures [video laser discs]" (*see generally* Def.'s Brief at 4, 17-18).

As discussed in greater detail below, the Government's arguments are unavailing; and the merchandise at issue is properly classifiable as a "[m]achine[ ] for the manufacturing of video laser discs," HTSUS subheading 8479.89.85, as Zomax has urged.

## A. The "Condition As Imported" Rule

The Government's threshold – and primary – argument against Zomax's proposed classification is the Government's claim that the two entries cannot be combined for classification because the "condition as imported" rule requires merchandise in separate entries to be classified separately. *See generally* Def.'s Brief at 3, 8-13.

As discussed in section II.B. above, the "condition as imported" rule is nowhere near as ironclad as the Government suggests. Indeed, as II.B. explains, Customs had a practice of combining "split shipments" (such as the entries here at issue) for purposes of classification in at least two major U.S. ports (LAX and JFK Airports), even before Congress enacted legislation expressly codifying it. That fact alone makes short work of the Government's argument. In short, Customs' practice of combining "split shipments" in at least some ports effectively refutes the Government's claim that the "condition as imported" rule is *inherently* incompatible with Zomax's proposed classification.

The Government also invokes <u>KMW Johnson, Inc. v. United States</u>, 13 CIT 1079, 728 F. Supp. 754 (1989). *See* Def.'s Brief at 8-9. However, that case – which dealt with the doctrine of "entireties" – is inapposite. The plaintiff in <u>KMW</u> sought to classify as an "entirety" the components of a paper-making machine which were imported in a total of 17 entries through multiple ports over a period spanning two years. According to the plaintiff, "[t]he size, complexity, cost, manufacturing and erection time of the machine rendered it physically impossible and economically unfeasible to import all the components in a single shipment." <u>KMW</u>, 13 CIT at 1082, 728 F. Supp. at 755.

What was dispositive in <u>KMW</u> was the definition of the doctrine of entireties, which expressly required that the merchandise sought to be classified be imported *in one importation*. *See* <u>KMW</u>, 13 CIT at 1082, 728 F. Supp. at 756 (*quoting* classic definition of doctrine, set forth in <u>Karoware, Inc. v. United States</u>, 427 F. Supp. 402, 411 (Cust. Ct. 1976)). However, the case at bar does not involve the doctrine of entireties, which is – in any event – now defunct.[17]

In sum, what the plaintiff in <u>KMW</u> sought to do was expressly prohibited by the doctrine of entireties, on which the plaintiff relied. In contrast, the principle that the Government invokes here is the "condition as imported" rule. And, as discussed above, nothing in that rule is inherently incompatible with the classification that Zomax here seeks.

## B. The Completeness of the System

The Government also argues that – even if the two entries at issue are combined for classification – Zomax has failed to prove that the merchandise constituted a complete (albeit

---

[17]The Government concedes that the doctrine of entireties is defunct. *See* Def.'s Brief at 9 (referring to the "extinction" of the doctrine).

unassembled) system, or in the alternative, that the merchandise had the "essential character" of a complete system. *See generally* Def.'s Brief at 2-4, 8, 10, 13 n.15, 14 n.18, 18-19.

To the contrary, Zomax has submitted the affidavit of the Zomax manager who oversees the department that uses the merchandise here at issue, who attests that it is a "complete digital laser disc mastering system." *See* Pl.'s Exh. B ¶¶ 3-4; *see also* ¶ 5 (describing merchandise post-assembly as "completed . . . system"). The Government proffers no testimony of its own to refute Zomax's affidavit.

In lieu of supplying any affirmative testimony or other evidence on this point, the Government instead argues that Zomax failed to meet its burden of proof. Specifically, the Government asserts that "at least one crucial component (the UV laser) was not included" in the entries at issue. *See* Def.'s Brief at 10. The Government also points to a "control panel" that Zomax sourced domestically (referred to on Plaintiff's Exhibit G, a videotape of the merchandise at issue, as assembled), and to a "surface analyzer" used in conjunction with the system. *See* Def.'s Brief at 10 n.11.

However, aside from the Government's naked assertion that these items are "crucial" (*see* Def.'s Brief at 10), there is no evidence that the system is (for tariff purposes) incomplete without them. Indeed, what evidence there is suggests otherwise. As explained on the videotape of the actual merchandise (Pl.'s Exh. G), the "UV laser" is a "consumable" – that is, an item that is replaced every six months or so. In other words, the laser is, in essence, a fancy light bulb. To

suggest that the laser encoder is incomplete without it is akin to arguing that a lamp is incomplete, for tariff purposes, without a light bulb – a position that even the Government must concede is erroneous.[18]

In any event, even assuming – *arguendo* – that the system were incomplete, it would nevertheless be classifiable as though it were complete, pursuant to GRI 2(a).[19]  The Government's challenge to the completeness of the system is lacking in substance.

----

[18]Indeed, as Zomax has observed, a laser printer imported *without the laser* is nevertheless classified as a laser printer.  *See* Audiotape of Oral Argument.

Similarly, as to the "control panel" and the "surface analyzer," there is simply nothing in the record to effectively refute Zomax's assertion that the merchandise at issue constituted a complete system.  Zomax's inability to pinpoint the "surface analyzer" on the invoice does not mean that the component was not included in one of the two entries.  Further, although there may be any number of additional machines or components that *may* be used in the mastering process, the record evidence – *i.e.*, Zomax's sworn testimony, as well as the purchase order and commercial invoice – supports Zomax's claim that the merchandise here constituted a complete system.

[19]The classification of all merchandise is governed by the General Rules of Interpretation ("GRIs"), which provide a framework for classification under the HTSUS.  *See*, *e.g.*, North Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001).

Pursuant to GRI 2(a), merchandise that consists of either a complete article entered in an "unassembled" state or an unfinished article that has the "essential character" of the complete article is classified under the same tariff provision as the complete, assembled article.

In cases such as this one, where the imported merchandise is unassembled,  the components – when assembled – must result in a substantially complete article.  *See*, *e.g.*, Authentic Furniture Products, Inc., v. United States, 343 F. Supp. 1372, 1380 (Cust. Ct. 1972).  One critical factor in determining whether merchandise is substantially complete is a comparison between the number of missing parts and the number of included parts.  *See* Daisy-Heddon, Div. Victor Comptometer Corp. v. United States, 600 F.2d 799, 803 (C.C.P.A. 1979).  Here, it is undisputed here that 46 of – at most – 49 components were included in the two entries at issue.  Moreover, as discussed above, the record is devoid of evidence to suggest that any missing components were of such a nature as to render the system other than "substantially complete."

C. Classification Under Subheading 8479.89.85

Finally, the Government argues that, even if the mastering system is classifiable as a single unassembled machine, it is not used to manufacture video laser discs and therefore cannot be classified under HTSUS subheading 8479.89.95, as Zomax proposes. *See generally* Def.'s Brief at 3-4, 13-18.

The Government's argument is two-fold. First, the Government contends that CDs and DVDs are not video laser discs, and therefore machines used in the manufacturing of CDs and DVDs do not fall within the tariff provision. *See generally* Def.'s Brief at 4, 13-17. And, second, the Government argues that – even if CDs and DVDs *are* video laser discs – "a machine that makes 'masters' for [video laser discs] is not the same as a machine that manufactures [video laser discs]." *See generally* Def.'s Brief at 4, 17-18.

As discussed in section I. above, it is axiomatic that the proper tariff classification of merchandise is determined through a two-step analysis: first, construe the relevant tariff headings; and, second, determine under which tariff heading the merchandise at issue falls. *See*, *e.g.*, Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997).

1. The Tariff Term "Video Laser Discs"

In accordance with GRI 1, classification begins with reference to the language of the relevant tariff schedule headings.[20] It is understood that tariff terms are to be construed in accordance with their common and commercial meanings, which, absent contrary evidence, are presumed to be the

---

[20]The term "headings" includes the subheadings indented thereunder. General Note 19(f), HTSUS.

same. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). In order to determine the common meaning of a tariff term it is proper to consult dictionaries, lexicons, scientific authorities, and other reliable sources. Lonza Inc. v. United States, 46 F. 3d 1098, 1106 (Fed. Cir. 1995).

Although "video laser disc" does not appear in any of the sources consulted, the term "laser disc" does. The Oxford English Dictionary defines "laser disc" as "a disc on which signals or data are recorded to be reproduced by directing a laser beam on its surface and detecting the light reflected or transmitted by it." The Oxford English Dictionary 67 (2d ed. 1989). "Laser disc" is also defined as "OPTICAL DISK; [especially]: one on which programs are recorded for playback on a television set." Merriam Webster's Collegiate Dictionary 656 (10th ed. 1997). "Optical disc," in turn, is defined as "a disc (such as a CD-ROM) on which data is stored or recorded using light . . . ." The Oxford English Dictionary (online ed.) *available at* http://dictionary.oed.com.

Thus, a "laser disc" is an optical disc[21] on which data is both recorded and read using light (*i.e.* a laser beam). The term "video" appearing before "laser discs" indicates that the data stored on the discs consists of images (and possibly sound) meant to be viewed on a television screen or computer display. *See* Merriam Webster's Collegiate Dictionary 1316 (10th ed. 1997) (definition of "video"). This is consistent with the existence of the term "video disc," which is defined as "a disc similar in appearance and use to a phonograph record on which programs have been recorded for playback on a television set; *also*: OPTICAL DISK . . . ." Merriam Webster's Collegiate Dictionary

---

[21]"Disc" and "disk" are used interchangeably without the difference in spelling appearing to denote any difference in meaning.

1317 (10th ed. 1997).  In other words, a video laser disc is an optical disc with video content; and it is the same thing as a video disc.

### 2. Whether CDs and DVDs Are "Video Laser Discs"

The Government asserts forcefully that CDs and DVDs are not video laser discs.  *See* Def.'s Brief at 14.  The Government claims that the term "video laser discs" as it appears in subheading 8479.89.85 of the HTSUS  refers *only* to discs that are 12 (or sometimes 8) inches in diameter, that are encoded in analog (as opposed to digital) format, and that must be "flipped" when played.  *See id*.  Thus, the Government appears to argue that the tariff term "video laser discs" refers only to the video discs manufactured from the late 1970s and into the 1990s known by copyrighted brand names such  as "LaserDisc" or "Laser Vision."  *See id*. at 14-15; Def.'s Exh. 9.

The Government's argument cannot prevail.  CDs and DVDs, and the branded discs referred to by the Government  are *all*, as the Government concedes, optical discs.  *See* Def.'s Brief at 14. This is evident from the common meaning of "compact disc" (*i.e.*, CD), which is, "a small plastic *optical disc . . .*",  Merriam Webster's Collegiate Dictionary 233 (10th ed. 1997) (emphasis added), and of  DVD, which is, "[a] type of compact disc . . . ."  The Oxford English Dictionary (online ed.) *available at* http://dictionary.oed.com.  Moreover, all three types of discs are  "video laser discs" or "video discs"– that is, optical discs on which video and other information can be stored for playback on a television or computer screen.  Indeed, a relevant encyclopedia entry explains that the "video disk exists in three major forms: the Digital Video Disk (DVD; sometimes called the Digital Versatile Disk); the Laser Video disk (sometimes called the Laser Vision disk); and the Video CD." McGraw-Hill Encyclopedia of Science & Technology vol. 19, 261(9th ed. 2002).

Thus, the tariff term "video laser discs" plainly encompasses optical discs with video content such as CDs and DVDs, as well as the "LaserDisc" or "Laser Vision" variety of discs favored by the Government.[22]  Further, nothing on the face of the tariff term "video laser discs" even remotely suggests that it is limited to discs of a certain size, or to discs with analog (versus digital) content, much less to discs that need to be – in the Government's words – "flipped."

Nevertheless, the Government maintains that Congress did not intend that  machines used to manufacture CDs and DVDs would be classified under 8479.85.85.  Def.'s Brief at 16.  In support of this assertion, the Government points out that numerous bills were proposed to the 106th Congress to amend subheading 8479.89.85 by replacing "video laser disc" with "digital versatile disc."  The Government concludes that "if the original drafters had intended for subheading 8479.89.85, HTSUS, to be sufficiently broad to encompass machines for making DVDs or CDs, there would have been no need of these proposed bills."  *Id.*

This argument is specious.  When there is ambiguity in a tariff term, resort may be had to legislative history to determine the intent of Congress vis-a-vis the tariff term.  Here, as discussed above, there is no ambiguity compelling such a course of action.  Moreover, assuming *arguendo* that

---

[22]It is also true that tariff terms are "written for the future as well as the present" and therefore are meant to encompass merchandise not known at the time of their enactment, provided that the subsequent merchandise bears an "essential resemblance" to the articles described by the tariff terms. *See* Sears Roebuck and Co. v. United States, 22 F.3d 1082, 1084 (Fed. Cir. 1994) (quotations omitted) (holding that camcorders manufactured in the 1990s were classifiable under a tariff provision for "television camera" and "tape recorder" enacted in 1962). Assuming, *arguendo*, that CDs and DVDs represent articles that came into existence *after* the enactment of the tariff provision "video laser discs" (although there is no evidence to that effect in the evidentiary record here), CDs and DVDs, as discussed at length above, clearly bear an essential resemblance – in terms of technology, function, and appearance – to the discs encompassed by the provision at the time of its enactment.

such an ambiguity exists, what legislative history there is, shows that the drafters intended for the tariff provision to include machines that manufacture CDs and DVDs. For example, in connection with one of the proposed amendments a member of the House of Representatives stated: "Under the established legal principle that legislation should be interpreted to take into account advancements in technology, *DVD manufacturing machines should be classified under the same duty free provisions as VLD* [video laser disc] *manufacturing machines. Customs, however, has ruled that DVD manufacturing machine are not classified under the duty provisions for VLDs . . .*[with] *the effect of negating the benefits of the Congress' 1994 legislation on VLDs.* 146 Cong. Rec. E213-02; Def.'s Exh. 11 (emphasis added).

Accordingly, the tariff term "video laser discs" encompasses CDs and DVDs with video content.

### 3. Whether "Masters" Are Video Laser Discs

In a last ditch effort, the Government argues that even if the tariff term "video laser discs" encompasses CDs and DVDs, the system here at issue produces *master* discs. The Government maintains that a master disc is not the same thing as the video laser disc itself.[23]

Once again, the Government's argument cannot be sustained. The master discs produced on Zomax's system are indeed optical discs on which video information is recorded in CD and DVD format. *See* Pl.'s Exh. B. And, as Zomax explains, they are playable on an industrial-grade DVD player producing the same output as any other DVD or CD. Pl.'s Reply Brief at 9-10. In fact, the

master disc is simply the original recorded disc from which copies are made for commercial distribution. *See* The Oxford English Dictionary (online ed.), *available at* http://dictionary.oed.com (definition of "master disc").

### IV. Conclusion

For all the reasons set forth above, the digital mastering equipment at issue here is properly classified as a "machine[ ] for the manufacturing of video laser discs" under subheading 8479.89.85 of the HTSUS.[24]  Zomax's motion for summary judgment is therefore granted.

Judgment will enter accordingly.

_____/s/_____
Delissa A. Ridgway
Judge

Decided:   April 1, 2005
               New York, New York

---

[24]This disposition obviates the need to reach Zomax's alternative proposed classification. *See* Pl.'s Brief at 28-30; Def.'s Brief at 18-19.

ERRATA

<u>Zomax Optical Media, Inc. v. United States</u>, Court No. 00-03-00104, Slip Op. 05-44, dated April 1, 2005.

Page 3:    In line 7 of paragraph 2, replace "112 F.3d at 1365" with "148 F.3d at 1365".

Page 4:    At the end of the existing text of footnote 5, insert:

Further, not only is this case in an unusual procedural posture, but it appears to be a case of first – and possibly also last – impression *as a matter of substance* as well. As Zomax notes, it is a case of *first* impression because the courts to date "have not had occasion to rule on the classification, under the [HTSUS], of a single machine which is shipped as a single item, but placed on different conveyances at the election of the carrier" – the precise issue here. *See* Pl.'s Brief at 16.

However, as Zomax further notes, there are now both a statute and implementing regulations directly on point (as discussed in sections II.B. and III.A. below), which expressly authorize "split shipments" such as the one at issue here to be treated as a single entry for customs classification purposes – provided that certain procedural requirements are met. *See* Pl.'s Brief at 16 (referring to 19 U.S.C. § 1484(j)(2) and 19 C.F.R. § 141.57, adopted after the events at issue in this action). Thus, because the situation presented in this action is now specifically addressed by statute and regulation, this may well be a case of *last* impression too.

In any event, the holding here is, by definition, of very limited application. Certainly nothing herein should be interpreted as expressing a view as to whether a failure to comply with the procedural requirements of 19 C.F.R. § 141.57 could ever be excused. Because the new regulations, and the new statute under which they were promulgated, are not applicable here, there is no occasion to reach that issue.

Page 5:    In footnote 7, substitute "video laser discs" for the acronym "VLDs" in both places where the acronym appears.

Page 5:    In footnote 8, replace "USCIT Rule 12(b)(5)" with "USCIT Rule 12(b)".

Page 7:    Delete the existing text of footnote 9, and substitute:

Congress recognized that "it is common that in air shipments, particularly, adjustments are made to the amount of cargo laden because of flight conditions. As a result of these shipping conditions, parts of entireties do not arrive together, which causes classification or entry problems with Customs." H.R. Rep. No. 106-789, at 132 (2000), *reprinted in* 2000 U.S.C.C.A.N. 2018, 2102.

Congress actually took action to address two distinct (albeit similar) scenarios. In addition to "importers whose shipments [are] intended to be carried on a single conveyance [but] are divided at the initiative of the carrier" (the situation in this case), the new statute also – separately – addresses "merchandise whose size or nature *necessitates*" that it "be shipped in an unassembled or disassembled condition *on more than one conveyance*." Single Entry for Split Shipments, 68 Fed. Reg. 8714 (emphasis added). *Compare* 19 U.S.C. § 1484(j)(1) (addressing merchandise that must be shipped unassembled/disassembled and cannot be shipped on a single conveyance) *with* 19 U.S.C. § 1484(j)(2) (addressing merchandise that importer intended to be shipped on single conveyance, but which was later split by the carrier and shipped on multiple conveyances on the initiative of the carrier).

Although Congress directed that Customs promulgate implementing regulations within six months of the enactment of the new statute (*see* Tariff Suspension and Trade Act of 2000, Pub. L. No. 106-476, § 1460, 114 Stat. 2101, 2171), the regulations implementing § 1484(j)(2) were not issued till almost two years after the expiration of Congress' deadline; and the regulations implementing § 1484(j)(1) still have not been promulgated. *See* Pl.'s Brief at 18 n.5 (noting that the regulations implementing § 1484(j)(2) were issued late, and that the regulations implementing § 1484(j)(1) had not yet been issued as of the time of filing of Plaintiff's Brief); Single Entry for Split Shipments, 68 Fed. Reg. 8714 (stating that regulations implementing § 1484(j)(1) "should be published . . . in the near future").

Page 8:     In footnote 10, delete the text beginning with "Similarly," through "the shipment has been split:" and substitute:

Another Comment and Response similarly acknowledge the pre-existing agency practice in place in at least some U.S. ports, pursuant to which so-called "split shipments" were already routinely being treated as a single entry for customs classification purposes:

Page 8:     Delete the existing text of footnote 11, and substitute:

The facts here are drawn from the affidavit testimony submitted by Zomax (Pl.'s Exh. B), together with other documentation on the record. The Government in this action elected to seek to make its case largely through legal argument, proffering no testimony whatsoever (and, indeed, relatively little affirmative evidence of any sort).

Although the parties may have dispensed with some of the finer points of evidence and procedure, there is no indication that any material fact is truly at issue here. And, in any event, as discussed in section I. above, no party is entitled to "rest upon . . . mere denials." USCIT Rule 56(e). *See also* Pl.'s Reply Brief at 6-7 (noting

that "Defendant cannot merely gainsay plaintiff's evidence in order to prevail").

Page 9:        In footnote 14, replace "#0737021741" with "#07437021471".

Page 14:       In paragraph 3 of footnote 19, delete "here" after "it is undisputed".

Page 17:       In the second full paragraph, after "The Government's argument cannot prevail.", insert:

               Dictionary definitions bolster the only record evidence directly on point – the affidavit submitted by Zomax, which attests that the term "video laser disc" refers to "any of the various formats of optical storage discs emanating from and controlled by patents for video laser discs." *See* Pl.'s Exh. B.  Therefore,

Page 18:       In line 2 of paragraph 2, replace "8479.85.85" with "8479.89.85", and insert "subheading" before that number.

Page 18:       In the last line of paragraph 2, replace "no need of" with "no need for".

Page 19:       In line 7, replace "*machine*" with "*machines*".

Page 19:       Delete the reference to footnote 23 in the text.

Page 20:       Footnote 24 should be re-numbered footnote 23, both in the text of page 20 and at the beginning of the text of the footnote itself.


April 21, 2005